## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| DEREK LUCAS, | ) | |
| | ) | |
| Movant, | ) | |
| | ) | **Cv. No. 2:14-cv-02324-STA-cgc** |
| v. | ) | **Cr. No. 2:11-cr-20032-02-STA** |
| | ) | |
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Respondent. | ) | |
| | ) | |

## ORDER ADDRESSING PENDING MOTION,
## DENYING MOTION PURSUANT TO 28 U.S.C. § 2255,
## DENYING CERTIFICATE OF APPEALABILITY,
## CERTIFYING APPEAL WOULD NOT BE TAKEN IN GOOD FAITH
## AND
## DENYING LEAVE TO PROCEED *IN FORMA PAUPERIS* ON APPEAL

Before the Court is the amended Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in Federal Custody ("Amended § 2255 Motion") filed by Movant, Derek Lucas, Bureau of Prisons register number 24503-076, an inmate at the United States Penitentiary McCreary in Pine Knot, Kentucky (Am. § 2255 Mot., *Lucas v. United States,* No. 2:14-cv-02324-STA-cgc (W.D. Tenn.), ECF No. 3) and Movant's motion seeking entry of default (Decl. for Entry of Default, *id.*, ECF No. 5). For the reasons stated below, the Court DENIES the motion for entry of default and DENIES Movant's Amended § 2255 Motion.

## I.        BACKGROUND

### A.        Case Number 11-20032

On February 8, 2011, a federal grand jury returned a two-count indictment against Lucas and four co-defendants, Derrick Dowdy, Charol Neal, Darnell Wallace and Aric Scott.

(Indictment, *United States v. Lucas*, No. 2:11-cr-20032-02-STA (W.D. Tenn.), ECF No. 26.) On

April 24, 2012, the grand jury returned an eight-count superseding indictment. (Superseding

Indictment, *id.*, ECF No. 149.) Lucas was named in Counts 1 and 2. Count 1 charged that, from

in or about December 2010 and continuing until on or about February 1, 2011, all defendants

conspired with each other and with other persons to possess five kilograms or more of a mixture

and substance containing a detectable amount of cocaine with the intent to distribute, in violation

of 21 U.S.C. § 846. Count 2 charged that, on or about February 1, 2011, all defendants, aided

and abetted by each other, possessed a Bryco Arms .380 caliber semi-automatic pistol, a Glock

.45 caliber semi-automatic pistol, a Smith & Wesson 9mm caliber semi-automatic pistol, and a

Romarm/Cugir, Model SAR-1, 7.62 x 39mm caliber rifle, in furtherance of the drug-trafficking

crime charged in Count 1, in violation of 18 U.S.C. §§ 924(c)(1)(A) and 2. On June 20, 2012,

the Government filed a notice pursuant to 18 U.S.C. § 3559(c) regarding Lucas's previous

convictions. (Information Regarding Previous Convictions, *id.*, ECF No. 171.)

The factual basis for these charges is stated in the presentence report ("PSR"):

6.      According to the investigative file, on December 7, 2010, agents
with the Bureau of Alcohol, Tobacco, Firearms, and Explosives (ATF) and the
Drug Enforcement Administration (DEA) interviewed a confidential informant
(CI) about possible home invasion targets in Memphis, Tennessee. The CI
identified Derrick Dowdy as someone who would be interested in participating in
a robbery. The CI advised that Dowdy was a member of the Crips street gang.

7.      The CI advised agents that he/she had met with Dowdy on
December 5, 2010, and told him that his/her cousin from Jackson, Tennessee, had
information about a potential robbery of narcotics in either Jackson or Memphis.
The CI reported to officers that Dowdy stated he was "hungry for this kind of
robbery." The CI told Dowdy that he/she would set up a meeting with his/her
cousin. Dowdy asked the CI when the meeting would take place several times.
The CI identified Anthony Dowdy, Derrick Dowdy's brother, as another possible
participant in the robbery. Anthony Dowdy was also a known member of the
Crips street gang.

8.	On December 9, 2010, the CI introduced Dowdy to an undercover agent (UC) in a meeting at Tops Barbeque restaurant in Memphis, Tennessee. During the meeting, the UC outlined a plan for a robbery in which several kilograms of cocaine would be stolen from Mexican drug couriers. The UC advised Dowdy that he met with Mexican drug couriers once per month and obtained approximately ten kilograms of cocaine at each meeting. The UC offered to provide Dowdy with the time and location of the next meeting with the couriers, giving Dowdy an opportunity to interrupt the transaction and steal the narcotics. The UC told Dowdy that at least three or four armed individuals were present during each meeting.

9.	Dowdy readily agreed to participate in the robbery and indicated that he and his associates had committed similar acts in the past. Dowdy agreed to supply the firearms and the additional personnel (approximately four or five individuals) needed for the robbery. Dowdy indicated that he and his associates would be willing to commit acts of violence in order to facilitate the robbery. Dowdy also stated that he owned black shoes, a black mask, and a black coat that he would utilize during the robbery. The CI and Dowdy agreed that the participants of the robbery would split the contraband between them. Before the meeting ended, Dowdy reported that he was going to purchase a Cricket cellular phone from an unknown subject named George (LNU). Dowdy indicated that he needed the Cricket cellular phone to further plan the robbery.

10.	Dowdy requested that the CI secure two rental cars to use during the robbery. According to Dowdy, the rental cars could be abandoned following the robbery and later reported as stolen. Dowdy also advised that he planned to relocate to Houston, Texas, subsequent to the robberies in order to "lay low." It was Dowdy's plan to only return to Memphis to collect the proceeds from the sale of the stolen narcotics.

11.	On January 4, 2011, the UC contacted Dowdy, who advised that he and four of his associates were ready to commit the robbery that had been previously discussed in December 2010. Dowdy told the UC that his associates planned to kill everyone present at the "stash" house and steal any narcotics stored there. Dowdy reported that it was his desire to simply "draw down" on everyone in the stash house. The UC questioned Dowdy about the types of firearms that he and his associates had in their possession. According to Dowdy, he was in possession of an AK-47 and his associates had two additional firearms.

12.	On January 6, 2011, the UC met with Dowdy, Louis Holmes a/k/a "Bookie" and "Lil B," Darnell Wallace a/k/a "Nook," and **Derek Lucas a/k/a "D" and "Dorrick Lucas"** regarding the robbery of narcotics. During the meeting, Wallace asked the UC how he wanted the robbery to occur. The UC stated that he would leave the robbery details up to the "robbery crew." Wallace advised that he planned to enter the stash house simultaneously with the UC and shoot a Mexican upon entry. The UC asked the robbery crew if they had access

to firearms, and they affirmed. Wallace reiterated that he would not hesitate to shoot upon entering the stash house. The UC advised that the narcotics shipment was scheduled to arrive in Memphis at the end of January.

13. On January 10, 2011, in the phone conversation with the UC, Dowdy advised that Louis Holmes a/k/a "Bookie" decided not to participate in the robbery. However, Dowdy told the UC that he still planned on using Holmes' AK-47 and ballistic vests. To replace Holmes as a member of the robbery team, Dowdy recruited Charol Neal a/k/a Charles Neal, who was also a known Crips street gang member.

14. On January 13, 2011, the UC met with Dowdy at Exlines' Pizza in Memphis, to discuss the robbery. Dowdy advised the UC that the robbery crew members would be dressed in all black with black ski masks on the day of the robbery. Dowdy also stated that all of the robbery crew members would have "choppers" (AK-47 rifles). According to Dowdy, once they entered the stash house, all the occupants would be made to remove all of their clothing and lie face down on the floor. During the meeting with the UC, Dowdy spoke of an occasion when he allegedly stole $8,000 from an individual. According to Dowdy, he contemplated robbing the same individual on a subsequent occasion.

15. On January 31, 2011, the UC contacted Dowdy and advised that the cocaine shipment would be in Memphis on February 1, 2011, and [sic] 8:00 p.m. The UC told Dowdy to have his robbery crew members ready. Dowdy told the UC that all of the members of his robbery crew would have firearms.

16. On February 1, 2011, at approximately 6:00 p.m., Neal and Wallace arrived in the parking lot of the International House of Pancakes (IHOP) on Sycamore View, in Memphis. The UC made contact with Neal and Wallace, specifically asking if Dowdy had informed them of the planned robbery of ten kilograms of cocaine. Neal stated that he and Wallace had been informed. The UC advised Neal and Wallace that the getaway vehicles were in close proximately to IHOP. Approximately fifteen minutes later, Dowdy and **Lucas** arrived in the parking lot of IHOP in a white Pontiac Sunfire driven by Aric Scott.

17. The UC departed the IHOP parking lot and traveled to the Extra Space Storage facility located at 5675 Summer Avenue, in Memphis. The storage facility was the designated area for the planned narcotics robbery. Upon arrival at the storage facility, all of the crew members exited their vehicles, except for Scott, who remained in the vehicle he was driving. The takedown signal was given and Dowdy, **Lucas,** Neal, and Wallace, were taken into custody, after brief foot chases within the storage facility.

18. The defendants were all transported to various locations to be interviewed. At approximately 10:15 p.m., agents interviewed Wallace. According to Wallace, he met with Dowdy in December of 2010, subsequent to

Dowdy's request for his assistance in a robbery. Wallace reported that he and Dowdy met several times to discuss the robbery of cocaine and money. Wallace advised that he was more interested in the money. Wallace advised that he was not armed for the robbery because Louis Holmes was supposed to provide the firearms for the robbery. Wallace was arrested in close proximity to where a Bryco .380 caliber pistol was found. Wallace denied any knowledge of the firearm.

19.     At approximately 11:05 p.m., Scott was interviewed at the Regional Medical Center (the Med) where he was receiving medical treatment for a minor cut to the chin. Scott advised that Dowdy was dating his sister, Tasha Scott. Tasha Scott asked Scott to drive Dowdy home at approximately 2:30 p.m. on February 1, 2011. On the way to Dowdy's residence, Dowdy told Scott that they were going to take care of someone and rob someone later that evening. Dowdy then told Scott that he needed him to drive to the site of the planned robbery. Dowdy promised to give Scott some money for his participation. Scott advised that he and Dowdy spent the remainder of the afternoon drinking beer, smoking marijuana, and using powder cocaine. Scott reported that he observed Dowdy place a long object wrapped in a black plastic bag in the trunk of Scott's white Pontiac Sunfire. Scott advised that he did not know what was in the bag. According to Scott, Dowdy told him that they were going to rob "five Mexicans and a black insider."

20.     On February 1, 2011, agents attempted to interview Dowdy at the Shelby County Correctional Facility (SCCC) in Memphis. Dowdy insisted that he did not know what was going on and refused to sign the Waiver of Rights to be interviewed. Dowdy advised that he needed to speak to a lawyer and would not make a statement.

21.     Also on February 1, 2011, agents attempted to interview **Lucas** at the SCCC. **Lucas** refused to sign the Waiver of Rights to be interviewed. **Lucas** advised that he did not want to talk or make any statement because he did not see how that was going to help in the future.

22.     Agents also attempted to interview Neal at the SCCC on February 1, 2011. Neal insisted that he did not know what was going on, but he signed the Waiver of Rights to be interviewed. Neal advised that he did not know anything about a robbery and that he thought he was going somewhere to get something to eat. Neal stated that he did not see how giving a statement would help him and did not make a statement.

23.     On February 2, 2011, an ATF agent examined the firearms that were recovered from Dowdy, **Lucas,** Neal, Wallace, and Scott. The firearms were as follows: **a loaded Bryco Arms, Model 38, .380 caliber pistol (serial number 1540165); a loaded Glock, Model 21, .45 caliber pistol (serial number MRU263); an unloaded Smith and Wesson, Model 469, 9mm caliber pistol**

**(serial number TAB7669); and a loaded Romarm/Cugir, Model SAR-1, 7.62x39mm caliber rifle (serial number S1703852003).** Subsequent investigation revealed that the firearms were not manufactured in the state of Tennessee and therefore, at some point, traveled in interstate and/or foreign commerce. Additionally, a search of the white Pontiac Sunfire also revealed a drum magazine with 57 rounds of ammunition, five work-style gloves, a black trash bag, and a 26-inch steel pry bar. Two tan rubber gloves were found on **Lucas's** person. Scott was in possession of a business card with powder cocaine residue on it. Neal was in possession of two small plastic bags of marijuana (1.97 grams).

(PSR ¶¶ 6-23.)

A jury trial on the charges against Lucas commenced on July 10, 2012. (Min. Entry, *United States v. Lucas,* No. 2:11-cr-020032-02-STA (W.D. Tenn.), ECF No. 198; Min. Entry, *id.*, ECF No. 199; Min. Entry, *id.*, ECF No. 202.) On July 13, 2012, the jury returned a guilty verdict on Counts 1 and 2 of the Superseding Indictment. (Min. Entry, *id.*, ECF NO. 203; Jury Verdict, *id.*, ECF No. 206.) At a hearing on October 31, 2012, the Court sentenced Lucas to life imprisonment. (Min. Entry, *id.*, ECF No. 251; Sentencing Hr'g Tr., *id.*, ECF No. 272.)[1]

Judgment was entered on November 5, 2012. (J. in a Criminal Case, *United States v. Lucas,* No. 2:11-cr-20032-02-STA (W.D. Tenn.), ECF No. 252.) The Sixth Circuit Court of Appeals affirmed. *United States v. Lucas,* 542 F. App'x 510 (6th Cir. 2013) (per curiam).

---

[1] Lucas was sentenced to life imprisonment on both Count 1 and Count 2.

The 2011 edition of the *Guidelines Manual* was used to determine Lucas's sentence. (PSR ¶ 27.) Section 2K2.4 of the United States Sentencing Guidelines ("U.S.S.G.") provides that the term of imprisonment for Count 2 is that required by statute. Lucas was sentenced to a mandatory term of life imprisonment on Count 2 pursuant to 18 U.S.C. § 3559(c)(1).

The sentence for Count 1 was calculated as follows: Pursuant to § 2D1.1(c)(4) of the United States Sentencing Guidelines ("U.S.S.G."), the base offense level for a drug offense involving at least five kilograms but less than fifteen kilograms of cocaine is 32. However, Lucas also qualified as a career offender under U.S.S.G. § 4B1.1, because of his previous Tennessee convictions for Aggravated Robbery (PSR ¶¶ 44, 46), Voluntary Manslaughter (*id.* ¶ 45) and Aggravated Assault (*id.* ¶ 53). Because the offense statutory maximum was life, the offense level was 37. U.S.S.G. § 4B1.1(b)(1). A career offender's criminal history category is always VI. U.S.S.G. § 4B1.1(b). The guideline sentencing range for Count 1 was 360 months–life and the restricted guideline range was life. U.S.S.G. § 4B1.1(c)(2)(A).

**B.      Case Number 14-2324**

On May 5, 2014, Lucas filed a *pro se* § 2255 Motion.  (§ 2255 Mot., *Lucas v. United States,* No. 2:14-cv-02324-STA-cgc (W.D. Tenn.), ECF No. 1.)  On February 18, 2015, Lucas filed his Amended § 2255 Motion that appears to be intended to supersede the original § 2255 Motion.  (Am. § 2255 Mot., *id.*, ECF No. 3.)  The amended § 2255 Motion presents the following issues:

1.      "This court lacks In personam and In rem jurisdiction" (*id.* at 2; *see also id.* at 2-4);

2.      "Amendment I deprivation of privacy/Freedom of speech/religion" (*id.* at 4; *see also id.* at 4-6);

3.      "Amendment II, deprivation to bear arms" (*id.* at 6; *see also id.* at 6-7);

4.      "Amendment IV deprivation, search and seizure/warrants/probable cause" (*id.* at 7; *see also id.* at 7-9);

5.      "Amendment V deprivation, Federal Due Process/self incrimination/double jeopardy" (*id.* at 9; *see also id.* at 9-10);

6.      "Amendment VI deprivation, Confrontation/presence/jury trial/speedy trial/counsel" (*id.* at 11; *see also id.* at 11-12);

7.      "Amendment VII deprivation, common law" (*id.* at 13; *see also id.* at 13-14);

8.      "Amendment VIII deprivation, Excessive bail and fines/Cruel and unusual punishment" (*id.* at 15; *see also id.* at 15-16);

9.      "Amendment IX deprivation, Enumeration/Construed/Disparage" (*id.* at 16; *see also id.* at 16-17); and

10. "Amendment X deprivation, Powers not delegated/Nor Prohibited/Are Reserved" (*id.* at 17; *see also id.* at 17-18).

On May 15, 2015, Lucas filed a motion seeking the entry of default against the Government for failing to respond to his Amended § 2255 Motion. (Decl. for Entry of Default, *id.*, ECF No. 5.) The entry of default is governed by Rule 55(a) of the Federal Rules of Civil Procedure, which "has no application in habeas corpus cases." *Allen v. Perini*, 424 F.2d 134, 138 (6th Cir. 1970). District courts may not enter default judgments in habeas cases without consideration of the merits of a prisoner's claims. *Id.*; *see also* Fed. R. Civ. P. 55(d) ("A default judgment may be entered against the United States, its officers, or its agencies only if the claimant establishes a claim or right to relief by evidence that satisfies the court."). The Government is not in default because the Court has not ordered a response to the original or Amended § 2255 Motions. *See* Rule 5(a), Rules Governing Section 2255 Proceedings for the United States District Courts ("§ 2255 Rules") ("The respondent is not required to answer the motion unless a judge so orders."). The motion for entry of default is DENIED.

## II.      THE LEGAL STANDARD

Pursuant to 28 U.S.C. § 2255(a),

[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

"A prisoner seeking relief under 28 U.S.C. § 2255 must allege either (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of

fact or law that was so fundamental as to render the entire proceeding invalid." *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (internal quotation marks omitted).

A § 2255 motion is not a substitute for a direct appeal. *See Ray v. United States*, 721 F.3d 758, 761 (6th Cir. 2013). "[N]onconstitutional claims that could have been raised on appeal, but were not, may not be asserted in collateral proceedings." *Stone v. Powell*, 428 U.S. 465, 477 n.10 (1976). "Defendants must assert their claims in the ordinary course of trial and direct appeal." *Grant v. United States*, 72 F.3d 503, 506 (6th Cir. 1996). This rule is not absolute:

> If claims have been forfeited by virtue of ineffective assistance of counsel, then relief under § 2255 would be available subject to the standard of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In those rare instances where the defaulted claim is of an error not ordinarily cognizable or constitutional error, but the error is committed in a context that is so positively outrageous as to indicate a "complete miscarriage of justice," it seems to us that what is really being asserted is a violation of due process.

*Id.*

Even constitutional claims that could have been raised on direct appeal, but were not, will be barred by procedural default unless the defendant demonstrates cause and prejudice sufficient to excuse his failure to raise these issues previously. *El-Nobani v. United States*, 287 F.3d 417, 420 (6th Cir. 2002) (withdrawal of guilty plea); *Peveler v. United States*, 269 F.3d 693, 698-99 (6th Cir. 2001) (new Supreme Court decision issued during pendency of direct appeal); *Phillip v. United States*, 229 F.3d 550, 552 (6th Cir. 2000) (trial errors). Alternatively, a defendant may obtain review of a procedurally defaulted claim by demonstrating that he is "actually innocent." *Bousley v. United States*, 523 U.S. 614, 622 (1998).

"[A] § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as an intervening

change in the law." *Jones v. United States*, 178 F.3d 790, 796 (6th Cir. 1999); *see also DuPont v. United States*, 76 F.3d 108, 110 (6th Cir. 1996) (same).

After a § 2255 motion is filed, it is reviewed by the Court and, "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion." Rule 4(b), § 2255 Rules. "If the motion is not dismissed, the judge must order the United States attorney to file an answer, motion, or other response within a fixed time, or to take other action the judge may order." *Id.* The movant is entitled to reply to the Government's response. Rule 5(d), § 2255 Rules. The Court may also direct the parties to provide additional information relating to the motion. Rule 7, § 2255 Rules.

"In reviewing a § 2255 motion in which a factual dispute arises, the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims." *Valentine v. United States,* 488 F.3d 325, 333 (6th Cir. 2007) (internal quotation marks omitted). "[N]o hearing is required if the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Id.* (internal quotation marks omitted). Where the judge considering the § 2255 motion also presided over the criminal case, the judge may rely on his recollection of the prior case. *Blanton v. United States*, 94 F.3d 227, 235 (6th Cir. 1996); *see also Blackledge v. Allison*, 431 U.S. 63, 74 n.4 (1977) ("[A] motion under § 2255 is ordinarily presented to the judge who presided at the original conviction and sentencing of the prisoner. In some cases, the judge's recollection of the events at issue may enable him summarily to dismiss a § 2255 motion . . . ."). Movant has the burden of proving that he is entitled to relief by a preponderance of the evidence. *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).

**III.**        **ANALYSIS OF MOVANT'S CLAIMS**

Lucas's Amended § 2255 Motion is entirely lacking in substantive merit.  Much of the content of the Amended § 2255 Motion is based on the erroneous premise that Lucas cannot be prosecuted in a federal court for federal crimes.  The Motion purports to assert violations of most of the provisions of the Bill of Rights, supported by biblical verses.

**A.        The Alleged Want of Jurisdiction**

Claim 1, titled "[t]his court lacks In personam and In rem jurisdicction" (Am. § 2255 Mot. at 2, *Lucas v. United States,* No. 2:14-cv-02324-STA-cgc (W.D. Tenn.), ECF No. 2), is largely incoherent.  Lucas refers to himself as "[a] Native American civilian [upper & lower case] Derek Lashun Lucas, the soveriegn [sic] inheriter [sic] of the Bill of Rights" (*id.*) and as "the Kidnapped Temple" of the Holy Spirit (*id.*).  According to Lucas, he has been kidnapped and prosecuted in a military jurisdiction under the fictitious name of DEREK LUCAS.  (*Id.*) Claim 1 refers to "immigrant status to the District of Columbia," "Admiralty/Maritime, regulations through the Commerce Clause," and "commercial contract laws, originating in the rules of trade upon the high seas between international merchants and [which] are enforced by military organizations, armed enforcement of the Law of Commerce, waiving [sic] a war flag." (*Id.*)  Lucas asserts that "[t]his court lacks In personam & In rem jurisdiction, over declaring a judgment on real religious property [Temple] the human body [upper & lower case] Derek Lashun Lucas, and to declare war would be to commit treason against the union."  (*Id.* at 3.)

Claim 1 is entirely lacking in substantive merit.  The trial court had jurisdiction over the criminal case pursuant to 18 U.S.C. § 3231, which provides that "[t]he district courts of the United States shall have original jurisdiction, exclusive of the courts of the States, of all offenses against the laws of the United States."  Lucas was indicted by a federal grand jury and charged

with violating federal criminal statutes. The original and superseding indictments charged that the offenses were committed in the Western District of Tennessee. Lucas was arrested in the Western District of Tennessee. Defense counsel was not ineffective in failing to raise this issue because it is frivolous.

Claim 1 is without merit and is DISMISSED.

## B. The Alleged First Amendment Violation (Claim 2)

In Claim 2, titled "Amendment I deprivation of privacy/Freedom of speech/religion" (Am. § 2255 Mot. at 4, *Lucas v. United States,* No. 2:14-cv-02324-STA-cgc (W.D. Tenn.), ECF No. 3), Lucas asserts that his right to privacy has been violated because he has been disenfranchised, transported against his will to various prisons, forced to perform work assignments for pennies a day, and confined to a special housing unit for twenty-three hours a day (*id.*). Lucas also argues, without elaboration, that he was entrapped in violation of his right to free speech. (*Id.* at 5.) The remainder of Claim 2 is indecipherable. (*See id.* at 5-6.)

Lucas's objections to the conditions under which he has been confined, both before and after his conviction, are not cognizable in a § 2255 motion, which addresses only the validity of the criminal judgment and the sentence that was imposed. *See supra* pp. 8-9.

As for Lucas's entrapment argument, the Sixth Circuit has explained that

[t]he defense of entrapment has two elements: (1) government inducement of the crime, and (2) the defendant's lack of predisposition to engage in the criminal activity. Whether a defendant has been entrapped generally is a question for the jury, not the court. In cases where the evidence bearing on the question of entrapment is in dispute, the defense of entrapment must be submitted to the jury.

*United States v. Allebban,* 578 F. App'x 492, 499-500 (6th Cir. 2014) (internal quotation marks and citations omitted), *cert. denied,* 2015 WL 1166062 (U.S. June 15, 2015) (Nos. 14-8793, 14A660).

On the merits, an entrapment inquiry typically centers on whether the defendant was predisposed to commit the crime. A predisposed defendant is one who is ready and willing to commit an offense apart from government encouragement, and not an innocent person in whose mind the government implanted a disposition to commit an offense.

Factors relevant to a defendant's predisposition include (but are not limited to) (1) the defendant's character or reputation, including any prior criminal record; (2) whether the government initially suggested the criminal activity; (3) whether the defendant was engaged in the criminal activity for profit; (4) whether the defendant evidenced reluctance to commit the offense, overcome only by repeated Government inducement or persuasion; and (5) the nature of the government's inducement or persuasion. A trial court is justified in denying an entrapment instruction only where the evidence clearly and unequivocally establishes that the defendant was predisposed to commit the crime.

*Id.* at 500-01 (internal quotation marks, alteration and citations omitted).

The record makes clear that Lucas did not have a viable entrapment defense. At trial, defense counsel asked for an *ex parte* hearing to address Lucas's decision to reject a plea offer. Defense counsel advised Lucas that "I have expressed to you my professional opinion that the defense of entrapment does not avail itself to you under the law in the Sixth Circuit." (07/09/2012 Trial Tr. 9, *United States v. Lucas,* No. 2:11-cr-020032-02-STA (W.D. Tenn.), ECF No. 259.) Lucas agreed that he did not want to testify at trial for various reasons, including that he did not want to be cross-examined about his prior criminal history. (*Id.*) Defense counsel advised Lucas that, if he did testify and denied that he had the predisposition to commit the crime, the Government would be able to elicit his convictions for aggravated robbery. (*Id.* at 10.) Defense counsel also opined that a videotape of a conversation with the undercover agent did not show any hesitation by Lucas to participate in the robbery. (*Id.* at 10-11.) Although Lucas did not agree with his attorney's analysis of the law, he conceded that his attorney had advised him on more than one occasion that his actions at a meeting on January 6, 2011 provided sufficient evidence to convict him on Count 1. (*See id.* at 14-15.) Lucas's Amended § 2255

Motion does not set forth any facts suggesting that defense counsel failed to advance a viable entrapment defense.

Claim 2 is without merit and is DISMISSED.

### C.     The Alleged Second Amendment Violation (Claim 3)

Claim 3 is titled "Amendment II, deprivation to bear arms."  (Am. § 2255 Mot. at 6, *Lucas v. United States,* No. 2:14-cv-02324-STA-cgc (W.D. Tenn.), ECF No. 3.)  Claim 3 is unintelligible.  Lucas argues that he was not exercising his Second Amendment rights during the events at issue because he did not personally possess a firearm.  He seems to contend that, because he was not charged with unlawfully possessing a firearm, his conviction for violating 18 U.S.C. § 924(c) is invalid.  (*Id.* at 4-6.)

Lucas overlooks the fact that Count 2 charged all defendants, *aided and abetted by each other,* with possessing firearms in furtherance of the drug trafficking crime charged in Count 1, in violation of 18 U.S.C. §§ 924(c) and 2.  Eighteen U.S.C. § 2(a) provides that "[w]hoever commits an offense against the United States or aids, abets, counsels, commands, induces or procures its commission, is punishable as a principal."  The jury was instructed that it could convict Lucas on Count 2 if he actually or constructively possessed a firearm or if he aided or abetted one or more co-defendant's possession of firearms.  (Jury Instructions at 22-26, *United States v. Lucas,* No. 2:11-cr-20032-02-STA (W.D. Tenn.), ECF No. 209.)  To convict Lucas as an aider and abettor, the Government was required to prove, *inter alia,* that Lucas "knew others were armed and . . . did perform some affirmative act relating to one or more of the firearms with the intent to assist or influence the commission of the underlying drug trafficking crime."  (*Id.* at 25-26.)  The jury concluded that Lucas personally possessed (either actually, constructively or jointly) a Romarm/Cugir, Model SAR-1, 7.62 x 39 mm caliber rifle (Jury Verdict at PageID 570,

14

*id.*, ECF No. 206), that he aided and abetted the possession of each of the charged firearms (*id.* at PageID 571), and that he is legally responsible for his co-conspirators' possession of each of the charged firearms (*id.*).

The Amended § 2255 Motion sets forth no facts suggesting that Lucas was wrongly convicted of violating § 924(c), either directly or as an aider and abettor. Lucas did not, and cannot, cited any authority for the proposition that a defendant can be convicted of violating 18 U.S.C. § 924(c) only if he also engaged in conduct that would constitute a violation of 18 U.S.C. § 922(g). The two statutes are entirely distinct: § 924(c) prohibits the use of firearms in connection with drug-trafficking crimes and crimes of violence, and § 922(g) prohibits convicted felons from possessing firearms. If Lucas's position were accepted, it would mean that only convicted felons could violate § 924(c) or, conversely, that the use of firearms in connection with drug-trafficking crimes and crimes of violence is acceptable so long as the firearms are used by persons without prior felony convictions. Claim 3 is without merit and is DISMISSED.

### D.    The Alleged Fourth Amendment Violation (Claim 4)

Claim 4, titled "Amendment IV deprivation, search and seizure/warrants/probable cause" (Am. § 2255 Mot. at 7, *Lucas v. United States,* No. 2:14-cv-02324-STA-cgc (W.D. Tenn.), ECF No. 3), is incomprehensible. Lucas avers that

> [a]gents [A.T.F., F.B.I., D.E.A.] unable to provide with each Jane or John Doe, but under the authority of Christopher Rogers [A.T.F.] was their services provided, conspired to oppress the enjoyment of the right without a complaint made at a probable cause hearing, supported by oath or affirmation or warrent [sic] committed by a magistrate based on the complaint, searched and seized real religious property [Temple] human body Derek Lashun Lucas, damaging it by processing [Seal] fingerprints to the [Temple] body into their corporate data bank, that possesses Jehovah's Holy Spirit, without proper claim, form of action, or a victim to make the claim, for their [sic] to be a form of action, and all was done under color of statute.

(*Id.* at 7-8.)  Lucas also complains that he was kidnapped and processed into the Shelby County Detention Center on February 1, 2011, where he was held without a complaint or warrant until February 3, 2011, thereby damaging his religious property.  (*Id.* at 8.)  A federal complaint, which was not based on a probable cause hearing, issued on February 2, 2011.  An arrest warrant issued that was not based on the complaint.  The indictment, which was returned on February 8, 2011, was returned by a grand jury that "was not drawn or summoned, and was not given the right to challenge . . . ."  (*Id.*)  Lucas avers that "their's [sic] no showing of probable cause, due to their [sic] not being no injury to another human being, property, or inhabitation."  (*Id.*)

The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the thing to be searched, and the person or things to be seized."  U.S. Const. amend. IV.  Nothing in Lucas's presentation of Claim 4 suggests that there has been a violation of the Fourth Amendment that is redressable in a § 2255 motion.  "[I]llegal arrest or detention does not void a subsequent conviction."  *Gerstein v. Pugh,* 420 U.S. 103, 119 (1975).  "[A]lthough a suspect who is presently detained may challenge the probable cause for that confinement, a conviction will not be vacated on the ground that the defendant was detained pending trial without a determination of probable cause."  *Id.*[2]  The taking of Lucas's fingerprints after his arrest also did not violate the Fourth Amendment.  *Maryland v. King,* 133 S. Ct. 1958, 1977 (2013).

---

[2] *See also Sanders v. Detroit Police Dep't,* 490 F. App'x 771, 773-74 (6th Cir. 2012) (holding that inmate can bring § 1983 suit seeking money damages arising from the timing of his probable cause hearing without having first succeeded in having his conviction overturned because "even if Sanders succeeded on his *Gerstein* claim, his domestic violence conviction would still be valid").

Claim 4 is without merit and is DISMISSED.

**E.    The Alleged Fifth Amendment Violation (Claim 5)**

Count 5 is titled "Amendment V deprivation, Federal Due Process/self incrimination/double jeopardy."  (Am. § 2255 Mot. at 9, *Lucas v. United States,* No. 2:14-cv-02324-STA-cgc (W.D. Tenn.), ECF No. 3.)  The factual basis is similar to that for Lucas's previous claims, namely, that federal agents entrapped Lucas, that the arrest warrant was not based on a written complaint and a probable cause hearing, that Lucas was kidnapped, that the grand jury was not properly constituted, and that Lucas was forced to incriminate himself by answering to his name during court proceedings.  (*Id.* at 9-10.)  The Motion further asserts that

> [p]roper search and seizure was deprived, by not issueing [sic] a complaint made at a probable cause hearing, for the warrent [sic] to be issued based on the complaint, that produced a injured human being who had written up the complaint approved by a UNITED STATES ATTORNEY, that lead to the search and seizure of real religious property [Temple] the human body Derek Lashun Lucas and the processing of fingerprints [Seal] into corporate data bank the possessions of Jehovah.

(*Id.* at 10.)  The Motion also avers that

> Double jeopardy accured [sic], when agents David Pritchard and Daniel French, Jerry Kitchen [PROSECUTORS] under color of statute, presented on the behalf of the UNITED STATES, the Indictments [CONTRACTS] that lead to the deprivation of Derek Lashun Lucas inherited rights, using other Indictments and previous judgments to enhance sentence § 3559 due to Presentence Investigation, presented by UNITED STATES PROBATION OFFICER Alice Conley under color of statute, declared against misnomer nom de guerre DEREK LUCAS, entrapping Derek Lashun Lucas into a Kidnapping to serve (2) Life Terms confined into the FEDERAL BUREAU OF PRISONS.

(*Id.*)

To the extent Claim 5 can be deciphered, it is meritless.  Lucas received the process he was due, having been indicted by a grand jury and convicted after a jury trial.  The use of previous convictions to enhance a defendant's sentence does not violate the Double Jeopardy

Clause. *Monge v. California,* 524 U.S. 721, 728 (1998); *United States v. Lawrence,* 735 F.3d 385, 427 (6th Cir. 2013), *cert. denied,* 135 S. Ct. 753 (2014); *United States v. Kelsor,* 665 F.3d 684, 701 (6th Cir. 2011) ("This court has squarely rejected defendant's contention that the enhancement of a sentence under § 841(b) on the basis of prior felony drug convictions violates double jeopardy.").

For the reasons previously stated, *see supra* p. 16, Lucas's challenge to the probable cause for his arrest is not redressable in a § 2255 motion. Lucas's argument is also meritless. "[T]he Constitution permits an officer to arrest a suspect without a warrant if there is probable cause to believe that the suspect has committed or is committing an offense." *Michigan v. DeFillippo,* 443 U.S. 31, 36 (1979); *see also Beck v. Ohio,* 379 U.S. 89, 91 (1964) (the constitutional validity of a warrantless arrest "depends . . . upon whether, at the moment the arrest was made, the officers had probable cause to make it—whether at that moment the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the petitioner had committed or was committing an offense."). Although Lucas's arrest on February 1, 2011, was not pursuant to a warrant, the arrest was constitutionally valid because investigators had probable cause to believe he was about a commit a crime, namely, the offenses alleged in Counts 1 and 2 of the superseding indictment. Indeed, at the time of his arrest, Lucas believed he was on his way to commit those offenses.

Claim 5 is without merit and is DISMISSED.

## F.     The Alleged Sixth Amendment Violation (Claim 6)

Claim 6, titled "Amendment VI deprivation, confrontation/presence/jury trial/speedy trial/counsel" (Am. § 2255 Mot. at 11, *Lucas v. United States,* No. 2:14-cv-02324-STA-cgc

(W.D. Tenn.), ECF No. 3), is largely incomprehensible. In arguing that his right to confrontation was violated, Lucas states that the United States, a corporation, could not confront him because it is a legal fiction and, therefore, that "the nature of the crime was hidden from me." (*Id.*) Lucas also avers that "to process a Debt [sin] in the name of the UNITED STATES, without doing a Fiduciary Discharge would be a violation of the Bankruptcy." (*Id.*) Lucas had a trial in which the witnesses against him testified. His attorney had the opportunity to cross-examine each of the Government's witnesses. There was no violation of the Confrontation Clause.

Lucas asserts that his right to a trial by jury was violated because this judge is a United States Bankruptcy Judge and because the jurors were selected from a pool of registered voters. (*Id.*) According to Lucas, "the instant a individual registers to vote, their [Jurors] ability to comprehend natural law is dissolved and turned into fiction." (*Id.*) These arguments are frivolous. As previously noted, *see supra* p. 6, the case was tried to a jury.

The alleged violation of Lucas's right to a speedy trial is also indecipherable. Lucas asserts that he "was not tried in a trial of the fiction jurors, that where [sic] provided until 7-9-2012 from 2-3-2011, which confined [kidnapped] into WEST TENNESSEE DETENTION FACILITY." (Am. § 2255 Mot. at 6, *Lucas v. United States,* No. 2:14-cv-02324-STA-cgc (W.D. Tenn.), ECF No. 3.) The Amended § 2255 Motion presents no legal analysis in support of the assertion that the time between Lucas's arrest and the trial violated the Sixth Amendment or the Speedy Trial Act. The docket reflects that, at Lucas's report dates, defense counsel requested additional time to prepare on March 24, 2011; May 26, 2011; July 21, 2011; August 25, 2011; September 22, 2011; and February 23, 2012. (Min. Entry, *id.*, ECF No. 68; Min. Entry, *id.*, ECF No. 81; Min. Entry, *id.*, ECF No. 99; Min. Entry, *id.*, ECF No. 101; Min. Entry, *id.*, ECF No. 105; Min. Entry, *id.*, ECF No. 132.) The trial was further delayed by Lucas's filing of a motion

on dismiss the indictment on November 21, 2011 (Mot. to Dismiss Indictment With Prejudice, *id.*, ECF No. 114), which was not resolved until February 21, 2012 (Order Denying Defs.' Mot. to Dismiss the Indictment, *id.*, ECF No. 130). The trial was further delayed by the filing of the superseding indictment on April 24, 2012.

The allegation that Lucas's Sixth Amendment right to counsel was violated is as follows:

Assistance of counsel was deprived, due to the conflict of interest behalf Derek Lashun Lucas, counsel [STEFFEN G SCHREINER] is a agent under color of statute of the same corporation [UNITED STATES], who misrepresents Derek Lashun Lucas as misnomer nom de guerre DEREK LUCAS citizen with immargant [sic] status to the District of Columbia, through Steffen Schreiner allegiance to the British Accreditation Regency [B.A.R.], another agency with allegiance to UNITED STATES corporation. Steffen Schreiner held his allegiance through the whole process, it was just more blatantly shown in the DEREK LUCAS prohibited ex parte hearing, after Steffen Schreiner [COUNSEL] could not convince Derek Lashun Lucas into a plea [CONTRACT AGREEMENT], from 2-4-2011 to 7-9-2012 [date of appointment & date of exparte hearing], in between the above mentioned dates counsel aided and abetted the delay of the trial [3-24-2011, 5-26-2011, 7-21-2011, 8-25-2011, 9-22-2011, 12-16-2011, & 2-23-2012] on these dates, said for time to prepare, unknowing of Derek Lashun Lucas all counsel was doing was buying time, thinking that I would enter into a plea. The record reveals his intentions at the ex parte hearing, he held his allegiance to the conspiracy to oppress the enjoyment of the right induced by other agents Phillip Thompson [INFORMANT] and Christopher Rogers [A.T.F.] under color of statute of the UNITED STATES, but broke his oath to uphold the Constitution, by asking Derek Lashun Lucas was I the same DEREK LUCAS the misnomer nom de guerre on the Indictment [CONTRACT], for me to say yes through his coercize [sic] entrapment ensuring Derek Lashun Lucas into becoming the surety, depriving the organic rights as a Native American. Aiding and abetting the other agents of the conspiracy to oppress the enjoyment of the right, knowing that I was being misrepresented, a foreigner to the language, and being denied due process of law, agent Christopher Bazeley [Direct Appeal Counsel] as well aid and abetted the misrepresentation of my Christian appellation as the misnomer nom de guerre denying me assistance case no: 12-6413.

(Am. § 2255 Mot. at 11-12, *id.*, ECF No. 3.)

Lucas's presentation of his ineffective assistance claim is indecipherable. The § 2255 Motion contains no facts suggesting that Steffen Schreiner, Lucas's trial counsel, operated under

an actual conflict of interest.  There is no allegation that Lucas suffered any prejudice from his attorney's requests for continuances for additional time to prepare.  Lucas was not prejudiced by his attorney's question, at the July 9, 2012 *ex parte* hearing, whether he was the same Derek Lucas who was charged in the superseding indictment.  (*See* 07/09/2012 Trial Tr. 9, *United States v. Lucas,* No. 2:11-cr-20032-02-STA (W.D. Tenn.), ECF No. 259.)  As the Amended § 2255 Motion repeatedly states, Lucas was fingerprinted upon his arrest and, therefore, had been identified prior to trial.

Claim 6 is without merit and is DISMISSED.

### G.    The Alleged Seventh Amendment Violation (Claim 7)

Claim 7, titled "Amendment VII deprivation, common law" (Am. § 2255 Mot. at 13, *id.*, ECF No. 3), is incomprehensible.  Lucas refers to the criminal case as a "commercial suit[]" and also mentions "defacing religious property in a Maritime/Admiralty jurisdiction."  (*Id.*)  The criminal investigation is described as a conspiracy to deprive Lucas of his right to due process. (*Id.*)  This judge is referred to as a bankruptcy judge and as an actor in the so-called conspiracy. (*Id.*)  The Amended § 2255 Motion allegations that "[i]njury was inflicted by the kidnapping damaging religious property [Temple] Derek Lashun Lucas processing the Image [Photo's [sic]] fingerprints [seal] into their corporate data bank, that lead to the grief of the spirit with the assistance of agent Steffen Schreiner [COUNSEL] appointed by UNITED STATES, from the results of confinement by the deprivation of rights."  (*Id.* at 13-14.)  The Amended § 2255 Motion further alleges that "[i]t would have been physically Impossible for Derek Lashun Lucas to conspire without exercising the freedom of speech . . . ."  (*Id.* at 14.)

The Seventh Amendment to the United States Constitution provides that, "[i]n suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by

jury shall be preserved, and no fact tried by a jury, shall be otherwise reexamined in any Court of the United States, than according to the rules of the common law." U.S. Const. amend. VII. The Seventh Amendment applies only to civil cases. *See Reid v. Covert,* 354 U.S. 1, 9 n.12 (1957) ("The right to trial by jury in a criminal case is twice guaranteed by the Constitution. It is common knowledge that the fear that jury trial might be abolished was one of the principal sources of objection to the Federal Constitution and was an important reason for the adoption of the Bill of Rights. **The Sixth Amendment reaffirmed the right to trial by jury in criminal cases and the Seventh Amendment insured such trial in civil controversies**.") (emphasis added). There was no Seventh Amendment violation in Lucas's criminal case because that Amendment is inapplicable.

Claim 7 is without merit and is DISMISSED.

## H. The Alleged Eighth Amendment Violation (Claim 8)

Claim 8 is titled "Amendment VIII deprivation, Excessive bail and fines/Cruel and unusual punishment." (Am. § 2255 Mot. at 15, *Lucas v. United States,* No. 2:14-cv-2324-STA-cgc (W.D. Tenn.), ECF No. 3.) In Claim 8, Lucas complains that he was denied bail. (*Id.*) Lucas also contends that he was subjected to cruel and unusual punishments:

> Cruel and unusual punishment was inflicted by the agents Phillip Thompson [INFORMANT] and Christopher Rogers [A.T.F.] for the inducement that lead to the deprivation of Derek Lashun Lucas organic Bill of Rights, enlisted throughout this motion as a Native American or American National Civilian. That provided other agents Jane and John Doe's [A.T.F., D.E.A., F.B.I.], unable to provide appellations to [Don't have records], but under authority of Christopher Rogers [A.T.F.] all under color of statute, the opportunity to search [without consent] and seize [kidnap] real religious property [Temple] human body [Seal] fingerprints Derek Lashun Lucas into their corporate data bank, making the property of Jehovah public dening [sic] privacy, to be judged by agents of UNITED STATES and not by Christ Jesus the righteous Judge. Giving rise for agent David Pritchard, Daniel French, and Jerry Kitchen [U.S. ATTORNEY'S], to misrepresent Derek Lashun Lucas on Indictment [CONTRACT'S] that a Grand Jury was not supposedly drawn or summoned, was not given the right to

challenge which is prohibited, the foreman records the vote and file a letter or certificate of concurrent with the Court Clerk and a transcript should be made available. Ensnaring Derek Lashun Lucas into a Maritime/Admiralty jurisdiction, knowing if he was to be prosecuted it would be Common [Criminal] suits. Allowing other opportunities of agents Charmiane Claxton and Diane K. Vescovo [MAGISTRATE JUDGE'S] under color of statute, before whom Derek Lashun Lucas was called upon to plead for a charge not triable to pass judgments, and agent Thomas Anderson [U.S. BANKRUPTCY JUDGE] the privileged authority to render judgment on real religious property [Temple] [Seal] [Image] Derek Lashun Lucas who is being confined [kidnapped] to be accountable for the judgment rendered on misnomer nom de guerre DEREK LUCAS who's not engaged in commerce, sentenced to (2) Life Terms for § 841, § 846, § 924(c), and § 2 unconstitutional statutes and void judgments presented by UNITED STATES PROBATION OFFICER Alice Conley. Derek Lashun Lucas was confined [kidnapped] in SHELBY COUNTY DETENTION CENTER from 2-1-2011 to 2-3-2011, before there was a void complaint or warrent [sic] against misnomer nom de guerre DEREK LUCAS, all to the benefit of UNITED STATES corporation.

(*Id.* at 15-16.)

Lucas's presentation of Claim 8 is incoherent. A challenge to a denial of bail cannot be litigated in a § 2255 motion because it does not affect the validity of the criminal judgment. *Kett v. United States,* 722 F.2d 687, 690 (11th Cir. 1984); *Crosby v. United States,* No. 2:11-cr-00023-GZS, No. 2:14-cv-00013-GZS, 2015 WL 1457430, at *17 (D. Me. Mar. 30, 2015) ("[C]laims relating to pre-trial bail are not cognizable under section 2255."), *appeal filed* (1st Cir. May 12, 2015) (No. 15-1560); *United States v. Harris,* No. 09 C 204, 2010 WL 431675, at *3 (N.D. Ill. Feb. 1, 2010) ("The purpose of a section 2255 motion is to challenge the conviction and sentence. A claim of denial of bail is not cognizable."). Even if that were not so, a denial of bail for an offender who presents a threat to the community or is a flight risk does not violate the Eighth Amendment. *Atkins v. Michigan,* 644 F.2d 543, 549 (6th Cir. 1981) (the Eighth Amendment "has never been interpreted to require that all persons awaiting trial be released on bail. The states have the authority to determine that certain arrestees are so dangerous to the

community because of either the nature of the crime with which they are charged or their propensity to flee before trial that they may be denied bail and incarcerated.").

To the extent Lucas is claiming that the circumstances of his arrest and pretrial detention constituted cruel and unusual punishment, his claim is meritless. The Eighth Amendment is not applicable to pretrial detainees. *Kingsley v. Hendrickson,* No. 14-6368, 2015 WL 2473447, at *8 (U.S. June 22, 2015) ("[P]retrial detainees (unlike convicted prisoners) cannot be punished at all, much less 'maliciously and sadistically.'"); *Ingraham v. Wright,* 430 U.S. 651, 664 (1977) ("An examination of the history of the Amendment and the decisions of this Court construing the proscription against cruel and unusual punishment confirms that it was designed to protect those convicted of crimes.").

Claim 8 is without merit and is DISMISSED.

## I. The Alleged Ninth Amendment Violation (Claim 9)

In Claim 9, titled "Amendment IX deprivation, Enumeration/Construed/Disparage" (Am. § 2255 Mot. at 16, *Lucas v. United States,* No. 2:14-cv-02324-STA-cgc (W.D. Tenn.), ECF No. 3), Lucas alleges as follows:

> Phillip Thompson [INFORMANT], Christopher Rogers [A.T.F.], Jane and John Doe's [A.T.F., F.B.I., D.E.A.,] under authority of Rogers, Brent Beavers [A.T.F.] who authorizes Rogers, Charmiane Claxton and Diane K. Vescovo [MAGISTRATE JUDGE'S], S. Thomas Anderson [U.S. BANKRUPTCY JUDGE], David Pritchard, Daniel French, and Jerry Kitchen [U.S. ATTORNEY'S], Steffen Schreiner [APPOINTED COUNSEL], Mark Dodson and Kristi Heasley [COURT REPORTERS], Silver, McKeague, and White [CIRCUIT JUDGE'S], Edward L Stanton III and Kevin G Ritz [U.S. ATTORNEY'S], Christopher Bazeley [APPOINTED APPEAL COUNSEL], Deborah S Hunt [CLERK], all under color of statute aid and abetted in one way or another, the conspiracy to oppress the enjoyment of the right to the enumeration, that contrued [sic] the statutes, to disparage Derek Lashun Lucas organic Bill of Rights, retained by the American National people, as if their authority derived from Mystery part of the Constitution.

(*Id.* at 16-17.)

The Ninth Amendment provides that "[t]he enumeration in the Constitution, of certain rights, shall not be construed to deny or disparage others retained by the people." U.S. Const. amend. IX. It is not clear how Lucas contends that his conviction violated his rights under the Ninth Amendment. The only decision in this circuit that has considered such a claim has rejected it. *See Wilson v. United States,* Nos. 3:05-cv-544, 3:04-cr-071, 2008 WL 2115695, at *4 (E.D. Tenn. May 19, 2008).

Claim 9 is without merit and is DISMISSED.

### F. The Alleged Tenth Amendment Violation (Claim 10)

In Claim 10, titled "Amendment X deprivation, Power not delegated/Nor prohibited/Are Reserved" (Am. § 2255 Mot. at 17, *Lucas v. United States,* No. 2:14-cv-02324-STA-cgc (W.D. Tenn.), ECF No. 3), Lucas alleges the following:

> The agents, all acting under color of statute of the UNITED STATES corporation, Phillip Thompson, Christopher Rogers, Jane and John Doe's, Brent Beavers, Charmiane Claxton, Diane K. Vescovo, David Pritchard, Daniel French, Jerry Kitchen, Thomas Anderson, Alice Conley, Steffen Schreiner, Mark Dodson, Kristi Heasley, Silver, McKeague, White, Edward L Stanton III, Kevin E Ritz, Christopher Bazeley, and Deborah S Hunt delegated with powers, prohibited Derek Lashun Lucas, reserved rights, as if they had no oath to the Constitution.

(*Id.* at 17-18.)

The Tenth Amendment to the United States Constitution provides that "[t]he powers not delegated to the United States, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. Const. amend. X. The Amended § 2255 Motion provides no coherent argument that Lucas's convictions for violating 21 U.S.C. § 846 and 18 U.S.C. §§ 924(c)(1)(A) and 2 violated the Tenth Amendment. The Court of Appeals has held that § 924(c) does not violate the Tenth Amendment because it "applies only to the use or carrying of a firearm during or in relation to a federal crime. It is a valid measure designed to deter the

violence associated with drug trafficking, an activity validly regulated by Congress under the Commerce Clause." *United States v. Dumas,* 934 F.2d 1387, 1390 (6th Cir. 1990). The Court of Appeals has also rejected a Tenth Amendment challenge to 21 U.S.C. § 846. *See United States v. Burgess,* Nos. 90-6187, 90-6329, 90-6346, 1992 WL 393575, at *2 (6th Cir. Dec. 21, 1992).

Claim 10 is without merit and is DISMISSED.

The motion, together with the files and record in this case "conclusively show that the prisoner is entitled to no relief." 28 U.S.C. § 2255(b); *see also* Rule 4(b), § 2255 Rules. The Court finds that a response is not required from the United States Attorney and that the motion may be resolved without an evidentiary hearing. *See Smith v. United States*, 348 F.3d 545, 550 (6th Cir. 2003); *Arredondo v. United States*, 178 F.3d 778, 782 (6th Cir. 1999). Movant's conviction and sentence are valid and, therefore, his § 2255 Motion is DENIED. Judgment shall be entered for the United States.

## IV.       APPEAL ISSUES

Twenty-eight U.S.C. § 2253(a) requires the district court to evaluate the appealability of its decision denying a § 2255 motion and to issue a certificate of appealability ("COA") "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also* Fed. R. App. P. 22(b). No § 2255 movant may appeal without this certificate.

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue(s) which satisfy the required showing. 28 U.S.C. §§ 2253(c)(2) & (3). A "substantial showing" is made when the movant demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were

adequate to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotation marks and citation omitted); *see also Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same). A COA does not require a showing that the appeal will succeed. *Miller-El*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814-15 (6th Cir. 2011) (same). Courts should not issue a COA as a matter of course. *Bradley v. Birkett*, 156 F. App'x 771, 773 (6th Cir. 2005).

There can be no question that the issues raised in Movant's Amended § 2255 Motion are meritless for the reasons previously stated. Because any appeal by Movant on the issues raised in his Amended § 2255 Motion does not deserve attention, the Court DENIES a certificate of appealability.

The Sixth Circuit has held that the Prison Litigation Reform Act of 1995, 28 U.S.C. §§ 1915(a)-(b), does not apply to appeals of orders denying § 2255 motions. *Kincade v. Sparkman*, 117 F.3d 949, 951 (6th Cir. 1997). Rather, to appeal *in forma pauperis* in a § 2255 case, and thereby avoid the appellate filing fee required by 28 U.S.C. §§ 1913 and 1917, the prisoner must obtain pauper status pursuant to Federal Rule of Appellate Procedure 24(a). *Kincade*, 117 F.3d at 952. Rule 24(a) provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. Fed. R. App. P. 24(a)(1). However, Rule 24(a) also provides that if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal *in forma pauperis*, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court. *See* Fed. R. App. P. 24(a) (4)-(5).

In this case, for the same reasons the Court denies a certificate of appealability, the Court determines that any appeal would not be taken in good faith. It is therefore CERTIFIED,

pursuant to Federal Rule of Appellate Procedure 24(a), that any appeal in this matter would not be taken in good faith.  Leave to appeal *in forma pauperis* is DENIED.[3]

IT IS SO ORDERED, this 1st day of July, 2015.


**s/ S. Thomas Anderson**
HON. S. THOMAS ANDERSON
UNITED STATES DISTRICT COURT

---

[3] If Movant files a notice of appeal, he must also pay the full $505 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within 30 days.